in his official capacity as Chief Executive Officer and Director of the U.S. Agency for Global Media. Mr. Beck for the appellants, Mr. Sinzak for the appellee. Mr. Beck and Mr. Sinzak, nice to see you. Sorry we can't see you in person, but this is as good as it gets for us. Mr. Beck, you have 15 minutes. Thank you and good morning and may it please the court.  I'm Michael Beck on behalf of the Plaintiffs Open Technology Fund and its directors. The question in this case is whether the U.S. Agency for Global Media, a federal agency, has the authority to remove and replace the officers and directors of Open Technology Fund, a private nonprofit corporation. The default rule in this country is that the federal government has no power to control the boards of private corporations. And that background principle is especially strong in this context where we're talking about a nonprofit corporation that's devoted to expressive activity. So for the government to prevail in this case, it has to show something special about OTF that separates it from a typical nonprofit. And the government points to two things. The International Broadcasting Act and OTF's own bylaws. It's wrong on both counts. Could I interrupt for one second? Yes. Even if it were right about the bylaws, isn't the point of our opinion in California independence system operator that there has to be a statute in order for which would authorize the government to take over a board? Yeah, there has to be. Oh, yes. I think that that's a good point. I mean, even assuming that bylaws sort of authorize a federal official to take this kind of action, a separate question is then can the federal official actually do that? And I think it's problematic that a private corporation could sort of draft a federal agent. It's not just problematic if the statute doesn't authorize somebody, a federal government official, to remove and replace a board. It doesn't matter what the bylaws say. Even if the bylaws say we'd like the Secretary of Defense to be our chair, to decide who's on our board. There is no statute that authorizes the Secretary of Defense to do that. I think that's right, Your Honor. And the statute sets out a limited set of powers that the CEO has, and that's not among them. Also, I think 6209D, it specifies, by specifying what kinds of officers and directors the CEO can appoint, it also, by implication, rules out appointing any other officers and directors for different kinds of organizations. So I think that's correct. Relatedly, Mr. Beck, do we have to reach the question of the limitations on Mr. Peck's authority if we think that his potential residual authority, if we think that the authority he's pointed to, which is authority over organizations that are authorized under the statute, if that's what he's relying on. And that is also the identical terms in the bylaws that he's relying on. And so I guess what I'm asking is, it seems, and I think your briefing supports this as well, that when the district judge said the statute doesn't authorize this, but the bylaws do, that seems internally inconsistent to me. Yeah, because the bylaws, they simply reference the statute. Normally, if you read a contract that just incorporates a statute, the only reasonable way to read that is incorporating the statute as it's actually written, not some alternative version of the statute that creates additional powers that aren't in the statute. So what if the statute's ambiguous as to whether Peck has this authority and he and Open Technology Fund both read that ambiguity that he does have this authority? So I think, first of all, you have to look, I think, at D.C. nonprofit corporate law and D.C. contract law, especially. And the rule in D.C., which is the default contract interpretation rule everywhere, is that the plain text controls if it's not ambiguous. Now, if there is an ambiguity, I think the next step is to look at what the default assumption. But I was saying, if there's an ambiguity in the statute and therefore in the statutory term that the bylaws incorporate, and if both the relevant parties say, oh, we think this puts us on a par with Radio Free Asia. Yeah. Well, I mean, just first off, I mean, there's certainly no evidence that that's what both parties thought. In fact, the only evidence of actual intent of someone involved in the drafting of the bylaws was Libby Liu's declaration below. And she was emphatic that she did not believe that Peck would be given this authority. And so and there's no contrary indication that the agency felt differently. In fact, if you look at the language of the bylaws, I think it backs that up. It says all the provisions regarding appointment of officers and directors say that they may be appointed as may be authorized under the act. And I don't know why they would have written as may be authorized if they definitely felt that it would be authorized in that case. Similarly, Section 9 of the bylaws, it talks, this is the part that talks about the CEO that actually discusses the CEO appointing directors and whether there's a conflict of interest in that case. And it says that there will be no conflict of interest from a CEO appointment, provided that such appointment is authorized under the act. That's pretty clear that there's an understanding that it may not authorize that. And I think- Is that really the question of whether the authorized under the act language of 6209 would include this entity that we're dealing with in this case? Is that not really the question or am I misreading things? I think that's right. The question is, is OTF authorized under the act? I think that gets right to the core of the question in this case. If it's not, then as was suggested earlier, the bylaws couldn't create a power in the government official that isn't there by statute. Would that not be- We have to come back to the statute rather than ending with the bylaws, right? I think that's how I would prefer to look at it as well, that the statute controls what the CEO's authorities are and the bylaws can't extend power beyond the limit that the statute creates. And OTF is not authorized under the act for the simple reason that it's not like the quasi-government broadcasting entities that are governed by the act. It's not mentioned anywhere in the act. It's not created by the act. It's not mentioned in any legislation that Congress has ever passed. In your own pleadings in the case, you refer to the entity as having been incubated within Radio Free Asia, right? That's correct. It was not incubated. It was conceived and hatched within Radio Free Asia as well, wasn't it? I would put it a little differently. I would say that the idea for Open Technology Fund began at Radio Free Asia, but the legal entity that's a corporation under D.C. law was created in 2019 by filing the Articles of Incorporation. The fact that the idea came from Radio Free Asia I don't think controls its nature. The implication for us of the D.C. Superior Court litigation, should we be abstaining or could that litigation resolve this litigation? Well, I think, Your Honor, that the primary questions in this case are the ones we've been talking about, which are questions of federal statutory interpretation, which I think is well within this court's domain. Now, what the D.C. courts have expertise in is the nonprofit law. And what the Attorney General said in its filing is that the background presumption and the normal assumption is that the directors control their own leadership. And I think as long as this case isn't going to turn on the presumptions of D.C. nonprofit law, I don't think there's a need in that case. What do you think the words are authorized under this act refer to if they don't refer to an entity like the one we have here? Well, I think it reflects sort of the unique nature of the International Broadcasting Act, which is kind of an accumulation over time of different entities that were founded over the past 80 years. Is it an empty set if we don't include in it the entity before us today? What does it include? Right now, I think it includes nothing. But I would point out that that problem is not one that's unique to our side, because at the time that the statute was passed in 2016, OTF did not exist as an organization. So that would be that would be consistent with it either being included or not included in the term or otherwise authorized. Right. What it means is that under both interpretations, there's a problem in that this phrase doesn't seem to include any entities at the moment. Radio Free Asia didn't just think of this idea, as you put it. I think your written document is better that it incubated this entity in Radio Free Asia. And unless it was acting as an unauthorized, renegade government agency, wouldn't you have to say it's authorized under this act? No, because I think authorized has a particular term of our meaning. I know it does, because I was in court governance for some years. We had to talk to the authorizer and the appropriators and beg them for money all the time. I know it is a term of art in that context, but this is not the same context, is it? In your briefing, you referred, Mr. Beck, to Radio Free Afghanistan as having been authorized or established. So, right, that's established under the act, but not authorized? No, I think Radio Free Afghanistan is authorized under that. That is one example of an organization that's not listed, but that could be included in that residual clause. I think a possible problem is that it's a subdivision of Radio Free Europe, so I didn't want to rely too heavily on that. But I do think that it is clearly authorized in the act, and that would, under the plain language, give the CEO authority over it. Back in 2004, when Congress created the Middle East Broadcasting Corporation, it did that in appropriations legislation, and it didn't mention it in the International Broadcasting Act. That happens to predate the statutory provision that we're talking about today, but if Congress did something like that next year, created a new broadcasting entity, which happens all the time, this is a constantly changing assemblage of different groups, then it wouldn't need to amend the International Broadcasting Act. It could just create new entities. As long as they're authorized under the act in the appropriations language, then they would be included in this clause. So I think it makes sense as sort of an accumulation statute of different organizations. And also, we point out in the briefs that the statute gives the CEO authority to incorporate new entities, and we think it's reasonable to think of that as Congress delegating to the CEO the authority to create new entities under the act. And in that case, those new entities I think would be reasonable to think that they're included in that phrase. I'd like to reserve the rest of my time for rebuttal unless there's more questions. Are there further questions from the bench? Okay, you may reserve your time. Mr. Sinzak. Thank you, Your Honor, and may it please the court. Jerry Sinzak on behalf of the government. You know, as has been discussed, this case focuses on primarily whether OTF is an organization authorized under the act, and so I just want to be clear as to what we think authorized under the act means. Could I just interrupt you for one second? Do you agree that if it's not authorized under the act that the bylaw argument is not relevant? So, Your Honor, I mean, I don't take that as an argument that plaintiffs have made here. And so, you know, I'm asking you a question now. The district court said it was not okay under the statute but is okay under the bylaws. What's your position? I don't understand how that's possible, and I'd like to know what your answer is on that. I mean, Your Honor, you know, at least as far as the plaintiffs haven't contested that, I know you're not. I don't want to focus on this. I understand your point from the case that you cited. That is the title of one of the sections of their brief, that there has to be statutory authorization. So what is the answer to that question? Your Honor, I'm not sure what the answer to that question is because it hasn't been briefed. It was briefed. It was in the amicus brief, so you knew this was coming. So the government must have an answer to this question. I don't have an answer to this question. I guess I would say at a minimum, it does shed light on the meeting of what OTF and what the government understood and USAGM understood the statute to mean. So at a minimum, I would say that. But, you know. But you're not. Are you willing? I'm not willing. I mean, I can't at this point concede because that argument hasn't been presented by the plaintiffs. But I would like to focus on. If you didn't have the statute and you just had a not-for-profit corporation that put in its bylaws or its charter, the Secretary of State or some other official can replace our board, that wouldn't work, would it? Your Honor, I agree that that would likely not work. So I do want to focus on the statute. You have to have the statute in order for anything to work, don't you? Yes, under this court's law, it has to. So I do want to focus on the statute. And I want to explain what authorized under means. It means authorized to function as a U.S. international broadcasting entity with funds provided by USAGM. And that requires that you agree to be subject to the IBA and its dictates, which include promoting U.S. foreign policy and acting consistent with U.S. foreign policy and being subject to USAGM's close oversight. And if we just take a step back and look at the practical reality of how this entity was formed. It wasn't a nonprofit formed out of nowhere. It was incubated by Radio Free Asia. It was spun off from Radio Free Asia at the request of USAGM. It went to Congress and said, Congress, please provide the funds to spin this organization off because we think we can oversee it better and streamline its operations better. Congress agreed to do that. It was incorporated by Radio Free Asia's president. Its board, its initial board, and at all times has been USAGM's governing committee. So if there's any organization that's authorized under the act, it's this one. And I would also just like to point out the history of U.S. international broadcasting. There are very few entities that have been in this realm. But, you know, as times have changed, as audiences have changed, as technologies have changed, some of these organization structures have changed. Radio Free Europe and Radio Free Liberty was merged. The Middle East Broadcasting Networks, which isn't otherwise established in this statute, it was spun off of Radio Free or Voice of America after 9-11. Obviously, the IBA contemplates the merger of Radio Free Asia and Radio Free Europe, et cetera. So Congress, when it's creating this catch-all provision, is contemplating that, you know, things will change in the future and there will be, you know, additional energies potentially spun off or consolidated. And that's exactly what happened here. OTF was spun off. And its whole purpose, its whole reason for being is to provide, you know, to further the policies of USAGM and U.S. foreign policy. And this will not, you know, open the Pandora's box, I think, that plaintiffs are presenting here to say that, you know, the same exact work it was doing under Radio Free Asia. There's no suggestion it's doing anything different. Mr. Sendzik, I must confess I've been distracted by your earlier assertion that Open Technology Fund didn't make the argument that the bylaws incorporation of the Act can't give the agency more authority than the Act itself gives. In other words, if the Act doesn't confer this authority, the bylaws can't either. And I had thought that was squarely in their briefing. And, in fact, it is. Well, yes. I mean, I guess their argument is it goes no further. Their argument is that it should be interpreted as at least the founders understanding it. But even if Your Honor accepts the argument. That's a very different argument. So, the Open Technology Fund argues that it doesn't matter whether, I'm going to flip the negatives, but that you're making an argument based on the bylaws in the alternative, even if you lose the statutory argument. And they're saying it just isn't an alternative argument if you lose the statutory argument. And your answer to that is that you're not addressing that? No, I guess, I mean, the answer that we gave was that, you know, bylaws ordinarily are interpreted according to contract principles. And that if everything about the bylaws exemplifies the understanding that the initial, not incorporators, but the initial board understood it would cover OTF. That's our argument. The separate argument that it couldn't have done that unless it had authority under the statute is not one that the plaintiffs themselves have made. All they're saying is. I understood that when Judge Santel asked you the same question, you said you agreed it was likely that. Yes, Your Honor. And I don't want to fight about that particular premise because I do agree that the case law is on their side about that. Although they didn't make that argument specifically. But I think we should focus on, you know, focusing on the statute itself. You know, OTF is clearly an organization that Congress had in mind that was authorized under this statute. And the difficulty then is how do you distinguish if receiving money and being part of what advances the overall objectives of USA Global Media? How do you distinguish the daycare or other recipients of? Well, as we said, first of all, there are very few other recipients. And what the key is, is that they have agreed to carry out U.S. international broadcasting activities. And, you know, the daycare isn't doing that. The daycare is providing, you know, an ancillary service to, you know, the employees of the people. It depends where you draw the line because the fund says it's an ancillary service, you know, supporting the technology capabilities and the, you know, privacy capabilities, but not actually itself broadcasting content. Well, I think, you know, the idea that this isn't a central tenant of U.S. international broadcasting is blind by both the statute itself, which says technology is an important and central part of international broadcasting. And also the report that USAGM submitted to Congress in asking that this entity be spun off and separately funded made clear that, you know, Internet dissemination is crucial to U.S. international broadcasting going forward. That, you know, this is an important technology that needs to be shared with the other entities and so on and so forth. And, again, if you look at just their bylaws and certainly the grant agreement, it makes clear that their reason for being, their purpose, is to further the strategy and policies of USAGM. And this isn't, again, this isn't a Pandora's box where there are going to be, you know, a number of entities that are, you know, tricked into thinking that they're now U.S. international broadcasters. You have to agree to, you know, form your policies around or your activities around U.S. foreign policy and to further the views of U.S. policies. And so that, you know, there aren't entities that are willing to do that. That's why there have been no private entities. There are no other entities that planets can identify. I guess I am a little worried that it could be a Pandora's box. I mean, there are a lot of private entities that have their own First Amendment rights and autonomy that work very closely with the government. And I'm thinking of, you know, social services organizations that are, when they take, they get a lot of money and they absolutely are carrying out governmental objectives in the way they administer that money. But they also are independent as a governance matter. And I'd be surprised if the assistance that they receive made them vulnerable to it. I understand that that's some steps away. But so just as a formal matter, not looking at sort of the understandings, but as a formal matter, your strongest argument for this authority is the statutory reference to authorized. Yes, that they are an organization authorized under the Act. Is your position then that any, if there is a nonprofit that's established totally on its own, and they accept grants, which require them under the statute to do, permit supervision, following the government's policies, etc., that any grantee who agrees to those kind of conditions, the board can be set by Mr. Pack? Is that the position? I mean, if they agree to be subject to USAGM's oversight in the IBA's principles and standards, yes, but there have only been four entities that have ever done so. So then we're going back to the question we asked before. If a corporation agrees to grant conditions, does that give the Cabinet Secretary the authority to replace their board? If there's a statute that says, you know, and we have to understand, what does that mean to say you can control the board of any entity authorized under the statute? Okay, what about in this, under this statute, in this program, you now have the Office of Internet Freedom that is within the USA Global Media, and it's giving grants. The technology companies that are acting pursuant to those grants, are they authorized within the meaning of the statute as you read it? Well, I don't know that that has started happening, but, you know, if an organization accepts a grant, and they agree to all these conditions, you know, that they are going to be a U.S. international broadcaster, that they're going to act consistent with U.S. foreign policy, that they will be, you know, funded by USAGM, then yes, they would be authorized under the statute. That would be automatic without having a separate provision in that agreement to that effect? That would be automatic just under the statute? It would be automatic under the statute, there wouldn't need to be a separate provision. So if I'm a tech company that receives money to support the broadcast mission, and I have some program that's to support the broadcast mission by doing tech support to journalists and repressive regimes, that alone is enough in your view? I just want to be clear, I mean, there haven't been such entities. There will be, because you've resurrected the Office of Internet Freedom, and I don't know if it does subsidiary grant making, maybe it doesn't, but if it did, that would seem to pose exactly that. Well, I mean, Your Honor, I mean, just again, if there haven't been, I mean, the reason why there aren't private tech companies willing to do this is because you have to agree to be effectively, you know, an arm of the U.S. government, that you have to, you know, promote U.S. government. Yes, you have independence, some measure of independence in your operations, but you're agreeing to act consistent with U.S. foreign policy. You're agreeing to conform your operations to U.S. AGM policy and strategy and its understanding of U.S. foreign policy. You're saying, though, that this statute authorizes Mr. Pack to set up new arms of the government, new nonprofits, in which he appoints the board. Well, I mean, the statute… Mr. Pack alone, as the CEO, has the authority to make the grants and then demand that they be the chair, that he appoint the board. Is that the government's position? Well, I mean, that's Congress's position in terms of… No, that's the government's position that that's Congress's position. You interpret this statute as allowing Mr. Pack to set up as many grantees as government entities as he wants and to appoint the board. That's the government's position. That's the government's understanding of the statute. If it's consistent with Congress's appropriation, yes. U.S. AGM didn't form OTF out of thin air. It went to Congress and said, please appropriate this money so that we can form this entity as a U.S. international broadcaster. There has to be something more than just a grantee. There has to be something more than just grantee status coming under the statute. You seem to be claiming that any grantee is within the catch-all on this statute. Is that really the government's position? No, I mean, not any grantee. Being a grantee makes you authorized under the statute? No, not any grantee, but a grantee that is agreeing or that is serving as a U.S. international broadcasting entity. You said there weren't any, but actually in the reply brief of OTF at page 8, there's a reference to the revived Office of Internet Freedom and a press release, which has given money to private software companies to advance the Internet Freedom objectives of the office and also USA Global Media. So I guess the question is, if they're authorized and they are agreeing, presumably, in their contracts receiving that money, then would the governance prerogatives of the CEO extend to them? And if not, what are you pointing to as a matter of the statute that would protect them? Well, again, if they're agreeing to be subject to the dictates of the IBA, one of the provisions of the IBA is that USA GM CEO has authority to report. I realize your time is over and I'm extending it, and I hate to do that, but isn't it possible that there are two categories of grant recipients of money from the government under these programs, one of which is a grantee that may have preexisted the grant, or an entity which is created from its beginning by an authorized entity like Radio Free Asia, incubated as the felon puts it, within that agency and spun off with Congress' funding and permission? Isn't that different than just a grantee? Your Honor, I agree with you that certainly this court could say that, at a minimum, those characteristics that you're identifying… Do you have to win on this proposition that all grantees could be covered? No, and we certainly don't agree that every grantee… I'm wondering why you're even fighting that position at all. Yeah, and I don't mean to fight it. I just want to be clear that, you know, certainly, OTF is in a unique spot because it was created… If nothing else, authorized under means an entity that was formed as part of a different broadcasting entity that was spun off of that entity with congressional approval at the request of the agency and so forth qualifies as one authorized under the statute. Whether it extends beyond that, this court wouldn't have to reach that. Is there a line item in the Appropriations Bill, in the Act, that mentions OTF? Not OTF specifically. There's the Internet Freedom provisions of the Appropriations Act that we cite. Right, but there is no appropriation line that specifically mentions this entity, is there? Not that I'm aware of. It approves money for grants, but it doesn't approve it for this specific agency. Well, I mean, for OTF or… For the Open Technology Fund, the entity which… I mean, to be honest, Your Honor, and I can look into this, but I'm not aware that it actually appropriates money for Radio Free Asia either or for… Yes, that's fine, but Radio Free Asia is mentioned in the statute. You made an argument that… …authorized by making an express appropriation for this and… Yeah, I didn't. If I said that, I misspoke. The only point I was making there is that it made clear that the types of activities that OTF is engaged in, Internet technologies, are funded by… are part of international broadcasting. Congress recognized that those are activities that fit within U.S. international broadcasting. Yeah, and that those can be… that grants can be made. Grants to further those… Yeah, at that point, I was making… This goes back to the question Judge Santel is asking. You are arguing that all grantees, that any grantee who agrees to all these provisions can have their board replaced. This is not really a separate argument on your part. Well, I guess I would put it two ways. I think that we do agree that if you agree to the IBA and all its dictates, yes, but I'm not… this court doesn't have to go that far to say that OTF is authorized under the Act because OTF… because of the unique circumstances surrounding OTF's creation and what it does and so forth. So, although, yes, the government's position… None of those unique things that you're talking about, that's legislative history, right? That's not in any statute or appropriations bill. That's correct, but… And you know courts generally think about legislative history independent from statutory text. Well, one thing I would point out, Your Honor, is the statutory text does provide that there will be consolidation of the other entities. So, Congress clearly had in mind that. Yes, and if that… No, that's quite clear. And I think that would be quite right. If it fell under that category, which are the consolidation of such entities, you would be fine. But that is not… you're not arguing that it falls within that category of the statute, are you? No, but the point being is the reason why Congress created a general catch-all, and usually a basic principle of statutory construction is you look at the specifically preceding items. You know, the reason it created is to capture what has happened in the past, which is things like consolidation or spinoffs of existing entities. At a minimum, you know, it makes sense to interpret what Congress was doing in light of that history. But the catch-alls normally use a word like or otherwise. Well, we cite a number… The statute does not say or otherwise authorized by. Your Honor, we cite a number of cases in our brief where there was a general provision, any election in one case, any tangible item in another, and that kind of general phrasing that didn't include the otherwise authorized language. And the Supreme Court looked at, you know, the specific list of items to determine what that meant. And if you look at those items, the only thing that they universally have in common is, you know, also held in common with OTF, that they were, you know, fully funded by USAGM. They serve as a U.S. international broadcaster. They're providing a U.S. international broadcasting service. They're dedicated and they've agreed to further USAGM policy and strategy. Okay, we're over time, assuming no further questions. Mr. Beck, you have some time for rebuttal. Thank you. I wanted to address Judge Sentelle's point about it being incubated, OTF being incubated in Radio Free Asia. And I think, you know, the government makes similar sort of argument that because they're, they sort of are associated with the same people and they're engaged in the same groups, that therefore they're authorized just like these other organizations are. And I think the problem with it is it's not consistent with the language of the statute. It says authorized under the Act. It doesn't say, you know, conceived of within an authorized organization. Only if an organization is authorized under the Act. And the problem with that is OTF is not even mentioned in the Act. It's not created. It's not, it's not, you know, given authorization to take any action or prohibited from doing any action. The very language there are, authorized under this Act, or authorized under this Act, excuse me, doesn't that suggest that we would not expect it to be mentioned by name in there? That's a catch all, isn't it? There has to be a possibility of an unnamed entity or you don't need that language. No. Well, Your Honor, I think it could be authorized under the Act either by being created by the CEO under Section 6209A, which gives them the authority to incorporate new entities. That would be under the Act. And also Congress could appropriate and authorize it in appropriations legislation. Nonetheless, the fact that the Act doesn't mention this entity by name doesn't really cut much ice when you have that language about our Authorized under the Act. I see what you're saying, Your Honor, but there are other ways that it can be authorized in appropriations legislation or the like. I see my time has expired. Further questions from the bench? All right. Thank you. This was very interesting argument. We appreciate it and we'll take the matter under submission. Thank you.
judges: Garland, Pillard, Sentelle